# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| CATHERINE L. ANDERSON, | ) | CASE NO. 1:19-cv-950 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Catherine L. Anderson (hereinafter "Plaintiff"), challenges the final decision of Defendant Andrew Saul, Commissioner of Social Security (hereinafter "Commissioner"), denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act"). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be REVERSED and REMANDED for proceedings consistent with this opinion.

## I. Procedural History

On November 7, 2013, Plaintiff filed her applications for DIB, and SSI, alleging a disability onset date of August 5, 2013. (Transcript ("Tr.") 13, 200-232). The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 72-113, 159). Plaintiff participated in the hearing on

December 4, 2014, was represented by counsel, and testified. (Tr. 29-59). A vocational expert ("VE") also participated and testified. *Id.* On December 22, 2014, the ALJ found Plaintiff not disabled. (Tr. 10-28). On May 13, 2016, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 4-8).

On July 5, 2016, Plaintiff filed a complaint in Case Number 1:16-cv-1707 challenging the Commissioner's final decision. On March 8, 2017, the undersigned Magistrate Judge recommended finding the ALJ erred by failing to give good reasons for rejecting the limitations assessed by Plaintiff's treating psychiatrists. (R. 11). On September 26, 2017, the Honorable John R. Adams found "the ALJ did not apply the requirements of the treating physician rule and has not provided a clear explanation of his failure to credit the limitations described by the treating sources. As such, the decision is not supported by substantial evidence." (R. 18, PageID# 800). The Court remanded for further proceedings. *Id.*

On August 15, 2019, an ALJ held a new hearing where Plaintiff and a VE testified. (Tr. 707-731). Plaintiff's counsel contended that a disability determination was warranted based upon the RFCs provided by psychiatrists Elise Bonder ("Dr. Bonder") and Scott Martin ("Dr. Martin"). (T. 712). At the hearing, the ALJ inquired whether Plaintiff would consider amending the alleged onset date to her 55th birthday. (Tr. 728-729). On that same day, Plaintiff filed a motion to amend her alleged onset date to the day before her 55th birthday. (Tr. 728-730, 868). The ALJ indicated that he would grant the motion if he found she could perform light work, but not if she could perform medium work. (Tr. 729). On November 8, 2018, the ALJ denied the motion and issued an unfavorable decision (Tr. 684-689).

On April 2, 2019, the Appeals Council denied Plaintiff's request to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 676-678). On

April 29, 2019, Plaintiff filed a complaint challenging the Commissioner's final decision. (R. 1).

The parties have completed briefing in this case. (R. 11, 14 &16).

Plaintiff asserts the ALJ erred by failing to give good reasons or a clear explanation for

rejecting the opinions of two treating psychiatrists—Dr. Bonder and Dr. Martin, and also because

the decision "partly relies on Drs. Johnston and Steiger who did not consider approximately 400

pages of material medical records." (R. 11, PageID# 1367-1372).

## II. Evidence

### A. Relevant Medical Evidence Addressed in the Prior Decision

The court previously set forth the relevant medical evidence as follows:

#### 1. Treatment Records

On October 21, 2013, Plaintiff was seen by psychiatrist Elise Bonder, M.D. (Tr. 619-620, Exh. 9F at pp. 57-58). Dr. Bonder's mental status examination revealed fair grooming and hygiene, a "sad" mood, a dysthymic affect, a tangential and circumstantial thought process, fair insight and judgment. (Tr. 619). Plaintiff was alert and oriented x 3 with fair concentration. *Id*. Plaintiff had no hallucinations and did not report any suicidal/homicidal ideation. *Id*. Dr. Bonder diagnosed major depressive disorder—severe and recurrent, anxiety disorder NOS, alcohol dependence, and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 55, indicating moderate symptoms.[1]

On November 4, 2013, Plaintiff was seen by Dr. Bonder. (Tr. 607-609, Exh. 9F at pp. 45-47). Plaintiff reported moderate to severe depression, which had been improving over the last two weeks since starting Remeron. (Tr. 607). Associated symptoms had also improved. *Id*. Plaintiff started regaining interest in activities, and she had no recent panic attacks. *Id*. On mental status examination, Dr. Bonder noted Plaintiff had fair grooming, a "better" mood, her affect was brighter, mood-

---

[1] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Ass'n, 4th ed. revised, 2000) ("DSM-IV"). An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* DSM IV at 34. An update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

congruent with a "more full range," her thought process was tangential and circumstantial, her insight and judgment were fair, and she was alert and oriented x 3 with fair concentration. (Tr. 607-608). Plaintiff had no hallucinations and did not report any suicidal/homicidal ideation. (Tr. 608).

On November 5, 2013, Plaintiff was seen by Mary Brahm, a licensed social worker ("LSW"). (Tr. 605-606, Exh. 9F at pp. 43-44). Plaintiff reported an improved mood since starting medication two weeks earlier. (Tr. 605). She noted having seven animals and good social support from close friends. *Id*. Plaintiff's diagnoses included major depressive disorder—severe and recurrent, anxiety disorder NOS, alcohol dependence in early remission, and was assigned a GAF score of 55. *Id*.

On November 25, 2013, Plaintiff was seen by Dr. Bonder. (Tr. 599-600, Exh. 9F at pp. 37-38). Plaintiff reported moderate to severe depression that continued to improve over the last four weeks since starting Remeron. (Tr. 599). Her interest continued to improve in walking her dogs, hunting for fossils, and meditation. *Id*. Motivation and concentration remained poor, but she was no longer having passive suicidal ideation. *Id*. Her severe global anxiety worsened since finishing her prescription for Ativan; she particularly worried about finances and being unemployed. *Id*.

On November 27, 2013, during a medication pick-up, Plaintiff told the nurse she was reading a book on depression and has a "little better understanding on her disorder." (Tr. 597). The nurse cautioned Plaintiff to "not take on s/s [signs and symptoms] just because she read them in a book." (Tr. 597).

On December 16, 2013, Plaintiff was seen by Dr. Bonder. (Tr. 591-592, Exh. 9F at pp. 29-30). On mental status examination, Plaintiff's mood was "better." (Tr. 591). She was calm and cooperative, her affect was dysthymic, her thought process was tangential and circumstantial, and her insight, judgment, and concentration were all fair. (Tr. 591). She was alert and oriented x 3, and had no hallucinations or suicidal/homicidal ideation. *Id*.

On December 30, 2013, Plaintiff was seen by Dr. Bonder. (Tr. 586-587, Exh. 9F at pp. 24-25). On mental status examination, her mood was "not good," and her thought process was less tangential and circumstantial. (Tr. 586). Otherwise, she was largely unchanged. *Id*.

On January 27, 2014, Plaintiff was seen by Dr. Bonder. (Tr. 578-579, Exh. 9F at pp. 16-17). Plaintiff had fair grooming and hygiene, a "better" mood but "down," a dysthymic affect, less tangential and circumstantial thought process, no hallucinations, no suicidal/homicidal ideation, fair insight and judgment, and she was alert and oriented x 3 with fair concentration. (Tr. 578).

On February 4, 2014, Plaintiff was seen by Dr. Bonder. (Tr. 570-571, Exh. 9F at pp. 8-9). Her mental status examination yielded the same results as the visit one week earlier. *Id.*

On March 7, 2014, medical records completed by a nurse note that Plaintiff picked up her medications, and that she was "pleasant and cooperative," her mood was "a little down, but [she was] willing to attempt to be active and positive." (Tr. 566, Exh. 9F at p. 4).

On May 5, 2014, Plaintiff was seen by Dr. Bonder, who noted Plaintiff had a "low" mood, a dysthymic affect, and poor concentration. (Tr. 639-640, Exh. 11F at pp. 6-7).

On June 2, 2014, Plaintiff reported to Dr. Bonder that she had moderate to severe depression that worsened after she intentionally discontinued Wellbutrin two weeks earlier due to side effects. (Tr. 642, 649 Exh. 11F at p. 9, 16). She reported low energy and motivation, but still read books though she had trouble concentrating on them. *Id.* She had good support from friends, who help her financially. *Id.* She denied any alcohol use since October of 2013, when she briefly relapsed after fourteen years of sobriety. *Id.*

On July 29, 2014, Plaintiff was seen by Dr. Bonder. (Tr. 653-654, Exh. 11F at p. 20). Plaintiff's social history included living alone with three dogs and three cats. (Tr. 653). Dr. Bonder's assessment included "a history of depression seen for a follow-up apt, her first with this provider. Partial response to Zoloft with regards to depression, much relief from anxiety from seroquel. Will uptitrate Zoloft to targe[t] depressive symptoms. Will consider suitability for resident therapy clinic, as patient has no therapy provider." *Id.*

On October 16, 2014, Plaintiff was seen by Kerning Gao, M.D. at the psychiatry department of University Hospitals. (Tr. 661-662, Exh. 12F at pp. 2-3). She reported her last panic attack was one year earlier. *Id.* On mental status examination, Plaintiff was alert, cooperative, and pleasant. *Id.* She was oriented x3, and had a depressed with a restricted affect. *Id.* She denied any hallucinations or suicidal/homicidal ideation. *Id.* Her memory was "ok" and her concentration was adequate. *Id.* Dr. Gao explained that treatment options included lithium, other mood stabilizers, other antipsychotics, or combinations of these drugs. (Tr. 662). He also explained the "[p]ros and cons" related to electroconvulsive (ECT) therapy, including potential death and permanent memory loss. *Id.* Plaintiff understood, and wanted to try ECT "as early as possible." *Id.* Plaintiff began ECT beginning on October 24, 2014, and continued to receive ECT throughout November of 2014. (Tr. 662-665).

**2. Medical Opinions Concerning Plaintiff's Functional Limitations**

On March 25, 2014, State Agency psychologist Karen Steiger, Ph.D., completed a mental RFC assessment. (Tr. 94-96, Exh. 5A at pp. 9-11). She opined that Plaintiff had no significant limitations in her ability to remember, understand, and carry out very short and simple instructions. (Tr. 94). She had moderate limitations in her ability to understand, remember, and carry out detailed instructions. *Id.* Dr. Steiger found Plaintiff was capable of understanding simple 2-3 step work tasks without strict production quotas or demands on time. *Id.* Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods. *Id.* She was also moderately limited in her ability to work in coordination with or in proximity to others without being distracted and in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 95). She was assessed as having moderate limitations in most areas of social interaction. *Id.*

On May 5, 2014, Dr. Bonder completed a check-box medical source statement concerning Plaintiff's ability to perform mental work-related activities. (Tr. 631-633). She opined that Plaintiff had extreme limitations in her abilities to perform the following activities: understanding and remembering complex instructions; carrying out complex instructions; and, making judgments on complex work-related decisions. (Tr. 631). She also found marked limitations in the following areas: understanding and remembering simple instructions; carrying out simple instructions; and, making judgments on simple work-related decisions. (Tr. 673). Dr. Bonder indicated that her opinion was supported by Plaintiff's poor concentration and difficulty making decisions. *Id.* In the category of interacting with others, Dr. Bonder opined that Plaintiff would have moderate limitations in her ability to interact appropriately with the public, supervisors, and co-workers, but marked limitations in her ability to respond appropriately to usual work situations and to routine changes in the work setting. (Tr. 632). The form states that "[t]he limitations above are assumed to be your opinion regarding current limitations only," unless the medical source could form a reasonable opinion as to the claimant's past limitations. (Tr. 632). Dr. Bonder marked "N/A." *Id.* She further indicated that alcohol or substance abuse did not contribute to the assessed limitations. *Id.*

After the hearing, on December 9, 2014, psychiatrist Jacob McBride, D.O., completed a check-box medical source statement concerning Plaintiff's ability to perform mental work-related activities. (Tr. 673-675). He opined that Plaintiff had marked limitations in her abilities to perform the following activities: understanding and remembering simple instructions; carrying out simple instructions; making judgments on complex work-related decisions. (Tr. 673). Meanwhile, he found only moderate limitations in her ability to carrying out complex instructions and only mild limitations in her ability to understand and remember complex instructions. *Id.* Dr. McBride indicated that his opinion was

6

supported by marked psychomotor retardation, dysphoric mood, and constricted effect, which made Plaintiff's ability to attend to activities of daily living a challenge. *Id.* In the category of interacting with others, Dr. McBride opined that Plaintiff would have moderate limitations in her ability to interact appropriately with supervisors and to respond appropriately to usual work situations and to routine changes in the work setting. (Tr. 674). In addition, he assessed mild limitations in interacting appropriately with the public and with co-workers. *Id.* The form states that "[t]he limitations above are assumed to be your opinion regarding current limitations only," and Dr. McBride did not complete portions of the form inquiring as to the onset of the above limitations or whether alcohol or substance abuse contribute to the assessed limitations. (Tr. 674).

*Anderson v. Berryhill*, No. 1:16-cv-1707, 2017 WL 4250003, 2017 U.S. Dist. LEXIS 157626, at

*3 (N.D. Ohio Mar. 8, 2017), *report and recommendation adopted by*, 2017 WL 4250003, 2017

U.S. Dist. LEXIS 157627 (N.D. Ohio Sep. 26, 2017) (Adams, J.).

**B. New Relevant Medical Evidence**[2]

Since the court's previous remand, the following relevant evidence has been added to the

record.

### 1.  Treatment Records

On October 24, 2014, Plaintiff began acute ECT therapy. (Tr. 1016). After each treatment,

Dr. Gao indicated that Plaintiff should not engage in sports, heavy work or lifting, driving or

consume alcohol for 24 hours, during which time it was recommended that a responsible adult

stay with Plaintiff due to possible light-headedness/dizziness. (Tr. 1037-1038, 1044-1045, 1051-

1052, 1058-1059, 1065-1066, 1074, 1080-1081, 1087-1088, 1094-1095, 1101-1102, 1108-1009,

1115, 1122-1123, 1129, 1136-1137, 1143-1144).

On October 27, 2014, Plaintiff had 5 of 5 recall on memory testing. (Tr. 1158).

---

[2]  The recitation of the evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and also deemed relevant by the court to the assignments of error raised.

On November 4, 2014, Plaintiff reported feeling much better since starting ECT, with improved mood, improvement in her ability to speak strongly, and leaving the house to go grocery shopping and walking dogs once in the park. (Tr. 897). She presented as neat, clean, calm, and cooperative; her mood was better with dysphoric affect and constricted range "but slightly fuller;" her speech was in a strained tone with low volume; her thoughts were linear and logical; and, her insight and judgment were fair. *Id*. Dr. McBride noted Plaintiff was "getting much better on ECT." (Tr. 898).

On November 18, 2014, Plaintiff again saw Dr. McBride and had mental status examination results echoed those from two weeks earlier. (Tr. 891). Plaintiff reported that "the ECT treatments are doing me good," but complained of "memory loss of days surrounding the procedure," but stated it was temporary. *Id*. She had cancelled two therapy appointments because "she doesn't have the energy." *Id*.

On December 9, 2014, Plaintiff saw Dr. McBride and she reported having more of a spark, more motivation, and feeling more alive after ECT. (Tr. 885). She reported major memory problems, including not recognizing a neighbor. *Id*. Her mental status examination was similar to the prior one, but she had a euthymic affect with full range though appeared anxious. *Id*.

On December 24, 2014, Dr. Gao observed Plaintiff's speech was slow, her affect was restricted most of the time, and her attention and concentration were adequate. (Tr. 1027, Exh. 21F/2-3). She was tolerating ECT well without complication. *Id*.

On January 5, 2015, Plaintiff had 4 of 5 recall on memory testing. (Tr. 1185).

Additional ECT therapy occurred in March and April of 2015. (Tr. 1211-1217, 1289-1295).

On April 6, 2015, Dr. Gao noted "no memory concern," stating her memory was fair. (Tr. 1226, Exh. 25F/37). He further noted her affect was appropriate and that she was tolerating ECT

well. *Id*. On the same date, Plaintiff had 3 of 5 recall on memory testing. (Tr. 1185, Exh. 26F/5).

On September 11, 2015, Plaintiff was seen by psychiatrist Scott Martin, M.D., after transferring over from Dr. McBride. (Tr. 906-910). Plaintiff reported "she is very improved" since staring treatment three years earlier, and wanting to work part-time but finding her depression and anxiety prevented her from doing so. (Tr. 906). On psychiatric examination she was well-groomed; oriented x 4; had normal language and attention/concentration; her fund of knowledge was appropriate for age/education; she was alert and cooperative with no perception disturbance; intact short term and long term memory; concentrated and blunted affect; euthymic and sad mood; fair to poor insight and judgment; slow thought process; and her thought content was appropriate to circumstances, impoverished, pessimistic and hopeless but without suicidal ideation. (Tr. 907-909). His impression was major depressive disorder recurrent and serve, in partial remission, generalized anxiety disorder, and alcohol dependence in remission. (Tr. 910).

On October 10, 2015, Dr. Martin saw Plaintiff for a scheduled follow-up. (Tr. 911-915). Changes on psychiatric examination included constricted and blunt affect, fair insight, sad mood, poor judgment, spontaneous thought process, and impoverished, hopeless, and helpless thought content. (Tr. 912-914). The plan was to continue medication, a referral for behavioral health counseling, and continued outpatient treatment to address recent impulse of self-harm by cutting. (T. 915).

On February 12, 2016, Plaintiff was seen by Dr. Martin after four months due to missing appointments and losing track of time. (Tr. 921). She thought she was improving, but reported her anxiety was still severe at times; she was isolating and escaping into books. *Id*. She was hoping to feel well enough to work again, but is "incapacitated by depression and amotivation, anhedonia and hopelessness at times." *Id*. Her psychiatric examination was notable for

disheveled appearance, normal language; normal attention/concentration; alert, cooperative behavior; intact short term and long term memory; concentrated and blunted affect; sad, anxious mood; fair to poor insight and judgment; spontaneous thought process; normal associations; appropriate thought content; and no suicidal ideation. (Tr. 922-924). The treatment plan included taking the same medication with a trial decrease in daytime Seroquel. (Tr. 925). Dr. Martin opined that "[o]verall risk based upon this encounter is moderate to high based upon severity of ongoing symptoms, use of high risk medication, significant impairment of functioning due to the condition, complications of comorbid condition, elevated risk of associated mortality, elevated risk of harm to self." *Id.*

On May 11, 2016, Plaintiff saw Dr. Martin, who noted Plaintiff frequently misses appointments. (Tr. 931). Plaintiff reported memory loss, losing track of time, and that "she does not attempt to structure her days or weeks and is actually averse to this." *Id.* On examination, Plaintiff was well-groomed, had normal attention/concentration; an appropriate fund of knowledge; was alert and cooperative; had intact short term and long term memory; broad affect; euthymic mood; fair to poor insight and judgment; spontaneous thought process; and, appropriate thought content. (Tr. 932-934). The treatment plan included continuing Zoloft and Seroquel, and overall risk was again moderate to high. (Tr. 935).

On July 6, 2016, Dr. Martin saw Plaintiff, who reported stability of mood despite ongoing depression and frustration with her lack of accomplishment and motivation. (Tr. 936). She still perceives poor memory, was considering "neuropsych testing," had cleaned her house, and was interacting with others more. *Id.* Her psychiatric exam revealed a broad affect, euthymic mood, intact short term and long term memory, fair to poor insight and judgment, spontaneous thought process, and no suicidal ideation. (Tr. 937-939). Her medications were continued, and overall

risk was assessed as moderate to high. (Tr. 940).

On September 28, 2016, Dr. Martin saw Plaintiff after three months, as Plaintiff had missed her previous appointment (T. 946). On examination, her short and long term memory were intact, she had a constricted and blunt affect, depressed mood; fair to poor insight and judgment; spontaneous thought process; and no suicidal ideation. (Tr. 947-949). Plaintiff's medications were continued, and Dr. Martin continued to assess Plaintiff's overall risk as moderate to high. (Tr. 950).

On January 18, 2017, Dr. Martin saw Plaintiff after nearly four months, following Plaintiff missing an interim appointment, and noting she is prone to withdrawing in the face of responsibilities. (Tr. 951). She saw a neuropsychologist at Metro General for her memory. *Id*. Plaintiff reported a stable mood, a low level of depression, and frustration at her lack of accomplishment and motivation with ongoing guilt. *Id*. On examination, Plaintiff had normal attention/concentration; intact short term and long term memory; constricted and blunted affect; euthymic mood; fair to poor insight and judgment; spontaneous thought process; and no suicidal ideation. (Tr. 952-954). Dr. Martin noted Plaintiff's medications for mood and anxiety had good affect. (Tr. 954).

On March 31, 2017, Dr. Martin saw Plaintiff and noted she generally misses every other appointment and is seen every three to four months. (Tr. 956). Plaintiff related a physician treating her for memory did not observe any significant memory deficits. *Id*. She reported some interim decline in mood last month coincident with her struggle between work and disability, and was isolating herself more and stopped attending weekly meetings she was attending. *Id*. She reported stability of mood, and low levels of depression. *Id*. Dr. Martin noted Plaintiff was resistant to working with a therapist, despite his strong recommendation. (Tr. 957). She

continued to isolate herself. *Id*. She reported some sedation from Seroquel. *Id*. On psychiatric examination, Plaintiff was disheveled; had normal attention/concentration; intact short term and long term memory; constricted and blunt affect; sad mood; fair to poor insight and judgment; spontaneous thought process; and no suicidal ideation. (Tr. 957-959). Her medications remained unchanged. (Tr. 959).

On May 12, 2017, Dr. Martin saw Plaintiff for treatment of depression, dysthymia, and substance use disorder. (T. 961- 964). Plaintiff reported stable mood with low levels of depression, poor memory, and losing track of time. (Tr. 961). Her psychiatric exam revealed she was well groomed, had normal attention/concentration, intact short term and long term memory, broad affect, euthymic and depressed mood, fair insight and judgment, and spontaneous thought process. (Tr. 962-964). The plan included continuing medications, recommended therapy again for personality traits, and continued outpatient treatment. (Tr. 964). Dr. Martin continued to assess her overall risk as moderate to high. *Id*.

On August 25, 2017, Plaintiff complained to Dr. Martin of "continued several daylong episodes of depression worsening monthly, also dysthymia persisting but at lower level. She is getting out more, including camping with dogs…." (Tr. 966). On psychiatric examination, she was well-groomed, had normal attention/concentration, intact short term and long term memory, constricted and blunted affect, euthymic and depressed mood, fair to poor insight and judgment, spontaneous thought process, and no suicidal ideation. (Tr. 967-969). The treatment plan remained unchanged. (Tr. 969).

On October 25, 2017, Plaintiff presented to Dr. Martin after canceling her prior appointment. (Tr. 972). She reported sustaining a better mood since her last treatment visit, less severe depression, and persistent dysthymia but at a lower level. *Id*. She was getting out more

and thinking of volunteering. *Id*. Her mental status examination was largely unchanged except that her affect was constricted. (Tr. 973-974). Dr. Martin again recommended therapy for Plaintiff's maladaptive personality traits, but Plaintiff was ambivalent and unable to commit. (Tr. 974).

On February 7, 2018, Plaintiff presented to Dr. Martin after canceling her prior appointment. (Tr. 977). She had a Hepatitis C diagnosis that Dr. Martin surmised may be contributing to Plaintiff's low energy and mood. *Id*. She was in a better mood with less severe depression, but her dysthymia persisted and was severe at times. *Id*. Despite Dr. Martin's recommendation, Plaintiff remained resistant to working with a therapist. *Id*. On mental status examination, Plaintiff had normal attention/concentration, intact short term and long term memory, constricted and stable affect, sad mood, fair to poor insight and judgment, and spontaneous thought process. (Tr. 977-979). A follow-up appointment was scheduled for six weeks out. (Tr. 980).

On April 9, 2018, Dr. Martin saw Plaintiff, who cancelled her previous appointment. (Tr. 982). She reported persistent depressed mood in context of her dog nearing the end of its life. *Id*. She was isolating and distracting herself more. *Id*. She was sleeping well with fair self-care, and reported being tearful, having periods of anxiety, and feeling guilty with passing thoughts of self-harm, without plan or intention. *Id*. On psychiatric examination, Plaintiff had a constricted affect, a euthymic and sad mood, fair to poor insight, and fair judgment. (Tr. 982-983). A follow-up appointment was scheduled for six weeks out. (Tr. 985).

On May 21, 2018, Plaintiff was a "No Show – No Call" for her appointment with Dr. Martin. (Tr. 986).

### 2.   Medical Opinions Concerning Plaintiff's Functional Limitations

On July 18, 2018, Dr. Martin completed a medical source statement concerning Plaintiff's ability to perform mental work-related activities. (Tr. 879-881). He opined that Plaintiff had marked limitations in understanding, remembering, and carrying out simple instructions, as well as marked limitations in her ability to make judgments on simple work-related decisions. (Tr. 879). In addition, Dr. Martin opined Plaintiff had extreme limitations in understanding, remembering, and carrying out simple instructions, as well as extreme limitations in her ability to make judgments on simple work-related decisions. *Id.* He explained that Plaintiff "has limited concentration and focus, with poor motivation much of the time causing serve impairment to even basic functioning, including self care." *Id.* Further, he opined Plaintiff had moderate limitations in interacting with the public and coworkers, and marked limitations in interacting appropriately with supervisors. (Tr. 880). He also assessed extreme limitations in Plaintiff's ability to respond appropriately to usual work situations and to changes in a routine work setting. *Id.* He explained Plaintiff had "[a]nxiety and mood disorders with tendency to isolate and avoidance of obligations, and interpersonal impairments limit appropriate socialization and interaction." *Id.* Dr. Martin asserted that the above limitations had been present since 2014 and were not caused by alcohol or drug use disorder. *Id.* Finally, he checked a box indicating Plaintiff cannot manage benefits in her own best interest. (Tr. 881).

### C. Relevant Hearing Testimony

At the August 15, 2018 hearing, Plaintiff testified as follows:

- She received a Bachelor of Science in history in 1983. (Tr. 713).

- She lives with three dogs and a cat. (Tr. 713).

14

- She had a nervous breakdown in 2014 when her mother passed away and eventually underwent electroshock therapy that caused her to have significant memory loss. She also reported problems concentrating and lack of stamina. (Tr. 714-715).

- Her medications makes her light-headed, but help her cope. (Tr. 715).

- She reported a tendency toward self-isolation and sometimes not leaving the house for months. (Tr. 715). She leaves her house approximately twice a month. (Tr. 722).

- She is an avid reader but forgets characters or the storyline and has to re-read several pages or a whole chapter every time she picks a book back up. (Tr. 715-716).

- Her reported lack of stamina includes both physical and mental components. Her chronic bronchitis caused her to lose strength, and her Seroquel medication makes her lightheaded. (Tr. 717).

- She was sober for eighteen years except for the week or so after her mother passed. *Id.*

- She had electroshock treatment from December of 2014 into February of 2015. She believed they helped in that she might have wanted to harm herself at that time, but reported significant ongoing and worsening memory issues three years later. (Tr. 719-720).

- She can drive, but does not like leaving the house so she performs all her errands at once. (Tr. 721).

- She takes Zoloft and Seroquel, which were prescribed by Dr. Martin. (Tr. 722).

- She does not shower daily and sometimes only once per month. (Tr. 724).

The ALJ posed the following hypothetical question to the VE:

> I'd like to assume a hypothetical individual who could work at all exertional levels, and who can understand, remember, and carry out simple instructions in a routine work setting, can respond appropriately to supervisors, coworkers, in work situations, if the tasks are goal oriented, but not at a production rate pace. And the worker function of the occupation in relation to people is limited to speaking singly, serving, or taking instructions, helping, as these are defined in the SCO.

(Tr. 725-726). The VE testified that such an individual could perform the following medium

exertional jobs: linen room attendant, Dictionary of Occupational Titles ("DOT") 222.387-030,

(2 million jobs nationally); checker, DOT 369.687-014, (537,000 jobs nationally); and tumbler,

369.685-0134 (18,000 jobs nationally). (Tr. 726). In addition, the VE identified the following light exertional jobs that the hypothetical individual could perform: garment sorter, DOT 222.687-014 (256,000 jobs nationally); checker I, DOT 222.687-010 (72,000 jobs nationally); and folder, DOT 369.687-018 (402,000 jobs nationally). (Tr. 726-727). The VE indicated that his testimony was consistent with the DOT. (Tr. 727).

The ALJ agreed that if he adopted either the opinions of Dr. Bonder or Dr. Martin, Plaintiff would be unable to engage in substantial gainful activity.[3] (Tr. 727-728).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner determines whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a medically determinable "severe impairment" or

---

[3]  Given the ALJ's admission, there is no question that the ALJ's decision to not fully credit the opinion of either Dr. Bonder or Dr. Martin cannot be construed as harmless *if* the ALJ failed to give good reasons for rejecting either opinion.

combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2018.

2. The claimant has not engaged in substantial gainful activity since August 5, 2013, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: depressive (affective) disorder and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of

work at all exertional levels but with the following nonexertional limitations: Can understand, remember, and carry out simple instructions in a routine work setting; can respond appropriately to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, but not at a production rate pace, and the worker function of the occupation in relation to people is limited to speaking-signaling, serving, or taking instructions-helping as these are defined in the <u>Selected Characteristics of Occupations</u>.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on *** and was 53 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experence, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 5, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 687-698).

## V. Law and Analysis

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a

whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6ᵗʰ Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id*. However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6ᵗʰ Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6ᵗʰ Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.   Plaintiff's Assignments of Error**

   **1. Weight Ascribed to Treating Sources**

In the primary assignments of error, Plaintiff argues the ALJ erred by failing to give good reasons or a clear explanation for rejecting the opinions of two treating psychiatrists—Dr. Bonder and Dr. Martin.[4] (R. 11, PageID# 1367-1372). The Commissioner does not challenge Plaintiff's assertion that Dr. Bonder and Dr. Martin are treating sources (R. 14), and the ALJ's decision expressly refers to them as treating Plaintiff. (Tr. 690-697).

"Provided that they are based on sufficient medical data, 'the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions

---

[4] "Plaintiff does not address Dr. McBride's RFC, because the Magistrate Judge rejected his RFC, which this Court found correct." (R. 11, PageID# 1368).

are uncontradicted, complete deference.'" *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002) (quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)). In other words, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)). If an ALJ does not give a treating source's opinion controlling weight, then the ALJ must give "good reasons" for doing so that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *See Wilson*, 378 F.3d at 544 (*quoting* Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5). The "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is "in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that [her] physician has deemed [her] disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (*quoting Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

Although an ALJ may not substitute his or her opinions for that of a physician, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009). It is well-established, however, that administrative law judges may not make medical judgments. *See Meece v. Barnhart*, 192 Fed. App'x 456, 465 (6th Cir. 2006) ("But judges, including administrative law judges of the Social Security

Administration, must be careful not to succumb to the temptation to play doctor.") (*quoting Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)). Moreover, an example of a good reason for discounting a treating physician's opinion is when the "opinion is 'unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.'" *Conner v. Comm'r of Soc. Sec.*, 658 Fed. App'x 248, 253-254 (6th Cir. 2016) (*citing Morr v. Comm'r of Soc. Sec.*, 616 Fed. App'x 210, 211 (6th Cir. 2015)); *see also Keeler v. Comm'r of Soc. Sec.*, 511 Fed. App'x 472, 473 (6th Cir. 2013) (holding that an ALJ properly discounted the subjective evidence contained in a treating physician's opinion because it too heavily relied on the patient's complaints).

Because it is undisputed that Drs. Bonder and Martin treated Plaintiff, the ALJ was required to provide good reasons for rejecting the limitations assessed by them. Because the ALJ's analysis with respect to the opinion of Dr. Martin is dispositive, the court focuses its attention primarily on the ALJ's discussion of that opinion. First, the court notes that the ALJ adequately set forth in the decision the treatment history between Plaintiff and Dr. Martin. (Tr. 693-695). The ALJ then set forth the following explanation for rejecting the opinions of Drs. Bonder and Martin:

> The undersigned affords only partial weight to the assessment of Dr. Bonder. While she had an established treating relationship with the claimant, the level of limitation alleged is not altogether consistent with the overall findings. Notably, in her treatment notes completed the same day as the functional assessment, Dr. Bonder assessed the claimant's impairments as "improving." She outlined that the claimant had marked to extreme limitations in performing simple to complex tasks, but in contrast, opined she retained the ability to manage her benefits on her own behalf. Further, clinical findings that included a cooperative and pleasant presentation, adequate to normal attention/concentration, and intact memory do not support the limitations noted (6F/11-12, 6F/17-20, 9F/7-9, 11F/2-4, 11F/5-7, 12F/2-3, 16F/25-29, 17F/1-5, 17F/11-15, 17F/26-30, 18F/2-5, 18F/7-11, 18F/17-20, 21F/2-3, 24F/9, 24F/36, 25F/37, 26F/5, 26F/16). For these reasons, only partial weight is afforded to the assessments of Drs. McBride and Martin, as the level of limitation alleged in both opinions are not consistent with the findings noted.… Further, treatment notes reflect that Dr. Martin maintained the claimant's

treatment regimen with little to no changes, supporting their general efficacy in keeping the claimant's psychological signs and symptoms stable (16F/25-29, 17F/11-15, 17F/26-30, 18F/2-5, 18F/7-11, 18F/17-20). Finally, the record contains no evidence that Dr. Martin treated the claimant in the three months prior to his assessment. (18F/27).

(Tr. 696).

First, the court notes that Dr. Martin began treating Plaintiff on or about September 11, 2015, and treated her for nearly three years by the time he offered his assessment on July 18, 2018. (Tr. 879-881, 906-910). To the extent Dr. Martin's opinion was rejected due to perceived inconsistencies with treatment notes from either Dr. Bonder or Dr. McBride from three to five years earlier, the court questions whether this constitutes a good reason given the passage of time and Dr. Martin's own extended course of treatment. More troubling, however, is the ALJ's lay interpretation of the mental health treatment notes. First, the ALJ concluded that "the level of limitation" alleged in Dr. Martin's opinion is "not consistent with the findings noted." (Tr. 696). This alone is insufficient as, without more, it constitutes an unexplained conclusion. Specific to Dr. Martin, the ALJ offered two reasons for effectively rejecting Dr. Martin's opinion: (1) Dr. Martin maintained the claimant's treatment regimen with little to no changes; and (2) Dr. Martin did not treat claimant during the three months predating his July 2018 assessment. (Tr. 696).

As to the second reason, the court is unaware of any authority that this constitutes a sufficient reason for rejecting a treating source opinion, nor does Defendant cite any authority suggesting as much. Further, as recounted above in Dr. Martin's treatment history, Plaintiff was typically scheduled to be seen every ninety (90) days but she frequently missed appointments and generally only made every other appointment resulting in her being seen every three to four months. Without specifically recognizing this, the ALJ appears to make the medical judgment that a treating psychiatrist's opinion expires after not having seen a patient for three months.

While Plaintiff's failure to comply with treatment may be an issue—an issue that has not been raised by the parties—the ALJ's rejection of Dr. Martin's opinion based on the timing of the opinion fails, on the present record and treatment history, to constitute a "good reason" under the facts and circumstances of this case.[5]

The ALJ also emphasizes that Dr. Martin maintained the claimant's treatment regimen with little to no changes, interpreting this fact to suggest that Plaintiff was doing well and therefore could not possibly be as limited as suggested by Dr. Martin's July 2018 opinion. (Tr. 696). While on its face this may appear to be a reasonable judgment, neither the ALJ nor this court have the medical expertise to render such a medical judgment. Mental health impairments can be especially difficult to understand for those with no formal training and medical expertise in the field. Here, the ALJ's reasoning is based on the unfounded assumption that an individual with the functional limitations assessed by Dr. Martin would have received more aggressive treatment, or, at the very least, different treatment. The underlying decision, however, overlooks that Dr. Martin consistently recommended therapy to Plaintiff, to no avail. Second, Plaintiff had already undergone rather aggressive treatment in the form of ECT therapy. Finally, to the extent Dr. Martin maintained Plaintiff's medications at a consistent level, the ALJ's assumption that either different medications or higher doses were warranted to buttress the doctor's opinion, however tempting to conclude, falls squarely into the medical judgment sphere and impermissibly displaces the doctor's opinion for the ALJ's interpretation of the evidence.[6] There

---

[5] The court has no opinion as to whether Plaintiff's habitual cancellations or no-shows are a symptom of her mental impairments or reflect a lack of cooperation with her prescribed treatment.

[6] The case law is well-established that an ALJ may not substitute his or her personal interpretation of the evidence for those of trained medical professionals. *See, e.g., Meece v. Barnhart*, 192 Fed. App'x. 456, 465 (6th Cir. 2006) ("[T]he ALJ may not substitute his own

was no medical expert testimony given, and the ALJ's decision lacks sufficient grounds for making the medical judgments underlying the decision's reasoning. The court understands that it is the ALJ's duty to assess the medical and non-medical evidence and render an RFC finding, and that a bright line is not always apparent when carrying out this duty. But the reasons given by the ALJ for rejecting Dr. Martin's opinion have strayed too far into the zone of medical judgments to constitute "good reasons."

The decision rejected Dr. Bonder's opinion because it was the ALJ's conclusion that a patient who has a cooperative and pleasant presentation, adequate to normal attention/concentration, and intact memory cannot be as limited as Dr. Bonder assessed. The decision suggests the same holds true for Dr. Martin's opinion. (Tr. 696). Again, the ALJ appears to be making medical judgments based on unfounded assumptions. The court does recognize that Dr. Martin based his limitations in response to question one in the form, at least in part, on Plaintiff's "limited concentration and focus," (Tr. 879), a statement admittedly that seems to contradict his frequent finding throughout the treatment notes that Plaintiff had normal attention/concentration. If the ALJ solely rejected these limitations, the "good reasons" requirement arguably may have been satisfied. However, in response to the second question in the form, Dr. Martin also assessed marked limitations in Plaintiff's ability to interact appropriately with supervisors and extreme limitations in her ability to respond appropriately to usual work situations or changes in a routine work setting. (Tr. 880). These limitations were

---

medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence.") (citing *McCain v. Dir., Office of Workers' Comp. Programs*, 58 Fed. App'x 184, 193 (6th Cir. 2003) (citation omitted); *Pietrunti v. Director, Office of Workers' Comp. Programs, United States DOL*, 119 F.3d 1035, 1044 (2d Cir. 1997); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990).

based on Plaintiff's anxiety, mood disorder, isolation, and avoidance of obligations. *Id*. The underlying decision does not explain how Plaintiff's cooperative and pleasant presentation, adequate to normal attention/concentration, and intact memory subverted Dr. Martin's opinion, as the limitations assessed were not based on her attention/concentration or memory issues. Again, the underlying decision does not explain how or why an individual—who is cooperative and pleasant on presentation, has adequate to normal attention/concentration, and intact memory—cannot also have the marked or extreme limitations as set forth by Dr. Martin. Without further explanation serving as the logical bridge to link the same, the court cannot find the decision clearly elaborates good reasons to discount the provider's opinion.

Finally, to the extent the ALJ's string citation to exhibits in the record (Tr. 696) ostensibly support a rejection of Dr. Martin's opinion, such string citation does not circumvent the "clear elaboration" requirement nor does it allow the court to conduct a meaningful review.[7] It is not this court's function to buttress an insufficient explanation for rejecting a treating source opinion by tracking down portions of the record that may provide a basis for discounting the treating source opinion.

Because this court recommends finding that a remand is necessary due to the underlying decision's lack of good reasons explaining the rejection of Dr. Martin's opinion, Plaintiff's remaining arguments are not addressed in the interests of judicial economy. However, on remand, the ALJ will have further opportunity to elaborate upon the weight assigned to the

---

[7] As stated by the Honorable Judge Adams in his prior remand, "the ALJ is charged not only to provide 'good reasons' but also with a 'clear elaboration requirement,' *Bowie v. Comms'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), which is 'imposed explicitly by the regulations ... in part to let claimants understand the disposition of their cases.'" *Anderson*, 2017 U.S. Dist. LEXIS 157627, at *10 (citing *Wilson v. Comms'r of Soc. Sec.*, 378 F.3d 547, 544 (6th Cir. 2002)).

opinions from acceptable treating medical sources and the alleged errors raised by Plaintiff.

## VI. Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be

REVERSED and REMANDED for proceedings consistent with this opinion.

s/ *David A. Ruiz*
David A. Ruiz
United States Magistrate Judge

Date: June 30, 2020

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the district court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).